## MEMORANDUM DECISION

Pursuant to Ind. Appellate Rule 65(D), this Memorandum Decision shall not be regarded as precedent or cited before any court except for the purpose of establishing the defense of res judicata, collateral estoppel, or the law of the case.



FILED

Jun 16 2020, 9:02 am

CLERK
Indiana Supreme Court
Court of Appeals
and Tax Court

ATTORNEY FOR APPELLANTS

Patricia L. Martin
Martin Law Office, P.C.
Angola, Indiana

ATTORNEYS FOR APPELLEE

John C. Theisen
Nathaniel O. Hubley
Theisen & Associates, LLC
Fort Wayne, Indiana

Allen R. Stout
Lisa L. Hanna
Stout Law Group, P.C.
Angola, Indiana

# IN THE
# COURT OF APPEALS OF INDIANA

In the Matter of the Estate of Thomas E. Phelps,

Colby Phelps, Hailey B. Phelps, and Kara L. Phelps,

*Appellants,*

v.

Erica K. Book,

*Appellee.*

June 16, 2020

Court of Appeals Case No. 19A-ES-2375

Appeal from the Steuben Circuit Court

The Honorable Allen N. Wheat, Judge

Trial Court Cause No. 76C01-1510-ES-70

**Mathias, Judge.**

[1] Kara Phelps ("Kara"), Hailey Phelps ("Hailey"), and Colby Phelps ("Colby") (collectively "the Phelps Children") appeal the order of the Steuben Circuit Court awarding Erica K. Book ("Erica") one-half of the net proceeds of a settlement agreement resolving a wrongful death claim asserted on behalf of the decedent, Thomas E. Phelps ("Thomas"), who was the father of the Phelps Children and the estranged husband of Erica at the time of his death. On appeal, the Phelps Children present two issues, which we restate as: (1) whether the trial court erred in its interpretation of the wrongful death statute with regard to the distribution of the proceeds of a wrongful death action, and (2) whether the trial court abused its discretion by awarding Erica one-half of the net proceeds of the wrongful death settlement. Concluding that the trial court did not err in either regard, we affirm.

## Facts and Procedural History

[2] Kara, Hailey, and Colby are the children of the decedent Thomas with his first wife. Kara, born in December 1992, is the oldest child. A second daughter, Hailey, was born in August 1996, and a son, Colby, was born in August 2004. All three children had a close relationship with their father. Kara had just received a degree in business management at the time of her father's death. She worked for her father's sanitation company, Sanitation Solutions, after graduation and lived with him until his death. Hailey was attending college at the time of her father's death. Thomas supported Hailey while she was in college by paying for her health insurance, car insurance, cell phone bill, and other college expenses. Colby was eleven years old at the time of his father's

death. Although Colby did not live with Thomas at the time of Thomas's death, Thomas paid child support and health insurance premiums for Colby.

[3] Erica was married to another man from 2003 until her divorce in 2012. Erica had two minor children from this prior marriage. Following Erica's divorce, Thomas asked her to work for his business, Sanitation Solutions. In the summer of 2012, Thomas petitioned to dissolve his marriage with his first wife, and he and Erica began to live together.

[4] Thomas and Erica were married in October 2013, and had one daughter together, who was born in June 2014. Prior to their marriage, Thomas and Erica entered into a prenuptial agreement that provided in pertinent part:

> Except as herein provided, in the event that the marriage of Tom and Erica is terminated other than by the death of one of them, or in the event of a *legal separation*, Erica agrees to waive and does hereby waive all rights to Tom's Property (as delineated in Section 2.1 above and as set forth in the Asset and Liability Disclosure appended hereto . . . .

Ex. Vol. p. 13 (emphasis added).

[5] Thomas and Erica separated in August 2014, at which time Erica left the marital home to live with her parents. On February 17, 2015, Erica filed a petition to dissolve her marriage with Thomas. Although Erica and Thomas still saw each other periodically, and engaged in sexual intercourse at least once, Erica also became romantically involved with another man. After the separation, Erica became pregnant with this man's child.

[6]     On October 19, 2015, Thomas was killed when he was struck by a vehicle while standing on the side of the road next to one of his sanitation trucks. Thomas died intestate. On November 2, 2015, Julie Maloy ("Maloy") was appointed as personal representative of Thomas's estate. On November 20, 2015, Maloy was appointed as special administratrix for the purposes of commencing a wrongful death action. Maloy filed a wrongful death suit that was ultimately settled.

[7]     On August 20, 2019, the trial court held a hearing regarding the apportionment of the wrongful death proceeds and the payment of estate administration fees. On September 13, 2019, the trial court entered findings of fact and conclusions of law, determining in relevant part that: (1) Erica was "living in a state of adultery" and therefore not entitled to one-half of Thomas's net probate estate under the intestacy statutes;[1] (2) Erica was entitled to a share of the proceeds of the wrongful death claim because such proceeds were not part of Thomas's estate and because, under the terms of the prenuptial agreement, she and Thomas were not legally separated at the time of Thomas's death; and (3) Erica was entitled to one-half of the net proceeds of the wrongful death claim, with Thomas's four children each entitled to a one-eighth share. The Phelps Children now appeal.[2]

---

[1] *See* Ind. Code § 29-1-2-14 ("If either a husband or wife shall have left the other and shall be living at the time of his or her death in adultery, he or she as the case may be shall take no part of the estate or trust of the deceased husband or wife").

[2] The trial court also found that Maloy played an active role in prosecuting the wrongful death suit and ran the day-to-day operation of Thomas's business until it was sold. Accordingly, the trial court concluded that

# Standard of Review

On appeal, the Phelps Children argue that the trial court erred in construing and applying the general wrongful death statute and the intestacy statutes. The construction of statutes is a matter of law that we review de novo. *In re Supervised Estate of Kent*, 99 N.E.3d 634, 637 (Ind. 2018).

## I. The Wrongful Death Statute

The Phelps Children first claim that the trial court erred by concluding that Erica was entitled to receive a share of the net proceeds of the wrongful death action. With regard to damages, the general wrongful death statute provides in relevant part:

> That part of the damages which is recovered for reasonable medical, hospital, funeral and burial expense shall inure to the exclusive benefit of the decedent's estate for the payment thereof. **The remainder of the damages, if any, shall, subject to the provisions of this article, inure to the exclusive benefit of the widow or widower, as the case may be, and to the dependent children, if any, or dependent next of kin, to be distributed in the same manner as the personal property of the deceased**. . . .

Ind. Code § 34-23-1-1 (emphasis added). The Phelps Children contend that the emphasized portion of the statute is ambiguous. We disagree.

---

Maloy should be compensated in the amount of $100,000 for her services as personal representative and that Maloy's counsel was entitled to $7,150 in unreimbursed out-of-pocket legal expenses.

[10] The wrongful death statute first provides that the portion of damages recovered for medical, hospital, funeral, and burial expenses inure to the exclusive benefit of the decedent's estate for the payment of such expenses. It then provides that any remainder of damages shall inure to the "exclusive benefit of the *widow* . . . and to the dependent children . . . to be distributed in the same manner as the personal property of the deceased." *Id.* (emphasis added). It is clear from this language that Erica, who is Thomas's widow, and Thomas's "dependent children"[3] are entitled to share in the remainder of the proceeds of the wrongful death action, less the amount recovered for medical, hospital, funeral, and burial expenses, in the same manner as they would Thomas's personal property. We find nothing unclear or ambiguous about this portion of the wrongful death statute.

[11] We also find the Phelps Children's citation to *In re Estate of Inlow*, 916 N.E.2d 664 (Ind. 2009), to be unavailing. In that case, an agreement settling the wrongful death claim did not specifically allocate any amounts between different types of damages, i.e., funeral and burial costs. The children of the decedent's first marriage argued that the wrongful death statute required the full payment of funeral and burial costs before distribution to any of the decedent's surviving family. Our supreme court noted that the wrongful death statute contained "no provisions expressly applicable to the distribution of proceeds

---

[3] The trial court concluded that all of Thomas's children were "dependent children" for purposes of the wrongful death statute. Erica does not challenge this conclusion.

from settlements before adjudication of the amount of damages." *Id.* at 666. The court further noted that wrongful death claims are often settled for less than the actual medical, funeral, and burial costs, and that to "impose upon all pretrial wrongful death settlements a requirement that the net proceeds must first be allocated to medical, hospital, funeral, and burial expenses before distribution for other damages could frequently . . . be inequitable and create an undesired counter-incentive to seek settlement." *Id.* at 667. The court therefore declined to construe the wrongful death act to impose such a requirement. *Id.* Instead, the court held that a trial court "should direct payment from the pretrial wrongful death settlement that part of the medical, hospital, funeral, and burial expenses that corresponds to the ratio of the total of such expenses to the estimated total damages sustained." *Id.* This may require that a trial court hear evidence "to enable it to ascertain the approximate total damages and thus determine a proportionate equitable allocation." *Id.* at 667–68.

[12]     In the present case, the question is not how to distribute the proceeds of the wrongful death settlement between the hospital, medical, funeral and burial costs on the one hand, and the survivors on the other hand. And here, the amount of the settlement is well in excess of the actual medical, hospital, funeral, and burial costs. *See* Appellant's App. p. 57 (listing the total of these expenses as $73,559.29). Thus, the question here is how to distribute the net proceeds of the settlement among the survivors *after* such costs have been paid from the award. And the wrongful death statute unambiguously provides that such proceeds inure to the exclusive benefit of the decedent's widow, i.e. Erica,

and dependent children, "to be distributed in the same manner as the personal property of the deceased." I.C. § 34-23-1-1. This leads us to the Phelps Children's next argument.

## II.  Erica's Share of the Proceeds

The Phelps Children argue that the trial court abused its discretion by awarding Erica one-half of the remainder of the proceeds of the wrongful death action. Again, we disagree. As noted above, the wrongful death statute clearly and unambiguously provides that Erica, as Thomas's widow, and Thomas's dependent children are entitled to share in the remainder of the proceeds "in the same manner as the personal property of [Thomas]." I.C. § 34-23-1-1. Thomas died intestate. The relevant portion of Indiana's intestacy statutes, Indiana Code section 29-1-2-1, provides:

> (a) The estate of a person dying intestate shall descend and be distributed as provided in this section.
>
> (b) Except as otherwise provided in subsection (c),[4] **the surviving spouse shall receive the following share**:
>
> > **(1)  One-half (½) of the net estate if the intestate is survived by at least one (1) child or by the issue of at least one (1) deceased child . . . .**

---

[4] Subsection (c) applies only if "the surviving spouse is a second or other subsequent spouse who did not at any time have children by the decedent[.]" As Erica had a child with Thomas, this subsection is not applicable here.

Ind. Code § 29-1-2-1 (emphasis added).

[14] Based on the plain language of this section, Erica, as the surviving spouse, would generally be entitled to receive one-half of the net estate, including personal property, because Thomas was survived by at least one child. The plain language of the wrongful death statute, in conjunction with the plain language of the intestacy statute, supports the trial court's conclusion that Erica is entitled to a one-half share of the net proceeds of the wrongful death action in the same manner as she would be entitled to Thomas's personal property.

[15] The Phelps Children insist that this is incorrect. They claim that Erica should not receive one-half of the net proceeds of the wrongful death action because Indiana Code section 29-1-2-14, part of the intestacy statutes, provides that "[i]f either a husband or wife shall have left the other and shall be living at the time of his or her death in adultery, he or she as the case may be shall take no part of the estate or trust of the deceased husband or wife."[5] Since the wrongful death statute provides that the widow is entitled to a share of the net proceeds of the

---

[5] Erica argues in her Appellee's Brief that she did not leave Thomas or live in adultery. But the trial court found otherwise, and there was ample evidence to support the trial court's finding. Erica testified that she "left the [marital] house," Tr. p. 65, and that she and Thomas "did not live together after filing for divorce." *Id.* at 69. She further testified that she had sexual intercourse with another man, with whom she later had a child, on a regular basis after the dissolution action was filed and before Thomas died. Still, Erica claims that she was not "living in adultery" because she was living with her parents, not her paramour. But the adultery statute does not require that the decedent's spouse to live with his or her paramour before its provisions are applicable; it simply requires that the decedent's spouse be "living in adultery." Adultery is defined as "Consensual sexual intercourse between a married person and a person other than the spouse." American Heritage Dictionary online, https://www.ahdictionary.com/word/search.html?q=adultery (last visited June 4, 2020) [https://perma.cc/2A7S-ERWF]. The trial court did not clearly err by determining that the adultery statute applied to Erica, who left the marital residence and had voluntary sexual intercourse with someone other than Thomas while still legally married to Thomas.

wrongful death action "in the same manner as the personal property of the deceased," and since Erica is not entitled to a share of Thomas's intestate estate due to the fact that she had left Thomas and was living in a state of adultery, the Children argue that Erica is therefore not entitled to any share of the net proceeds of the wrongful death action. Although this argument has some facial appeal, it ultimately cannot stand.

[16] The "adultery" section of the intestacy code provides that a spouse who has left the decedent and is living in a state of adultery at the time of the decedent's death shall take "no part of the *estate* or trust" of the decedent. I.C. § 29-1-2-14 (emphasis added). But it has long been held that the proceeds from a wrongful death action are not part of the decedent's *estate*. *See Goldman v. Cha*, 704 N.E.2d 157, 158 (Ind. Ct. App. 1999) ("Wrongful death proceeds do not become part of the decedent's estate and are not subject to claims of creditors of the decedent.") (citing *In re Estate of Bruck*, 632 N.E.2d 745, 748 (Ind. Ct. App. 1994)); *Thomas v. Eads*, 400 N.E.2d 778, 783 (Ind. Ct. App. 1980)).

[17] In *Bruck*, we held that wrongful death proceeds did not become part of the intestate estate but instead "pass through *intestate distribution*." 632 N.E.2d at 748 (emphasis added). In other words, wrongful death proceeds are not part of the decedent's estate but are distributed in the same manner as if they were part of the intestate estate. And the adultery statute acts to bar an adulterous spouse only from taking part of the decedent's *estate*, which does not include the proceeds of a wrongful death claim.

[18]     We therefore conclude that, even though Erica may not be entitled to share in Thomas's estate, the wrongful death proceeds are not part of Thomas's estate. Such proceeds, even though not part of the decedent's estate, are to be *distributed* as set forth in the intestacy distribution statute, which provides that the widow of the intestate shall receive one-half of the estate if the intestate is survived by at least one child. Ind. Code § 29-1-2-1(b)(1). Erica is therefore, as the trial court concluded, entitled to one half of the net proceeds of the wrongful death action.

[19]     The Phelps Children claim that it is unjust for Erica to receive half of the net proceeds of the wrongful death action. To do so, they observe that Indiana's child wrongful death statute—as compared to the adult wrongful death statute at issue here—specifically excludes the distribution of damages recovered in a wrongful death action to a "parent or grandparent who abandoned [the] deceased child while the child was alive[.]" Ind. Code § 34-23-2-1(i)(3). And they note that the adultery provision of the intestate probate code prohibits Erica, as the adulterous spouse, from receiving a portion of the intestate estate. The Phelps Children then pose the question, "If the wrongful death statutes for the death of a child, consider the existence of abandonment, and the probate codes address it, why wouldn't the criteria for the adult wrongful death distribution include a similar analysis?" Appellant's Br. at 16. This is not a question for a court, but for a legislative body. For whatever reason, the general wrongful death statute simply does not include similar language regarding abandoning spouses. Indeed, the absence of such abandonment language from

the general wrongful death statute is all the more telling given the presence of such language in the child wrongful death statute. We will not read into the statute a provision the legislature clearly did not include. The Phelps Children's arguments that the result of this case is unjust or inequitable are inapposite given what we consider to be the plain language of the statutes at issue.

## Conclusion

The trial court did not err by concluding that the wrongful death statute unambiguously provides that the net proceeds of the wrongful death statute inure to the exclusive benefit of Thomas's widow, Erica, and his dependent children, to be distributed in the same manner as Thomas's personal property. And under the intestacy statutes, Erica is entitled to one-half of such property as Thomas's widow. Although the adultery section of the intestacy code may deprive Erica of the right to receive distributions from Thomas's estate, the wrongful death proceeds are not part of Thomas's estate. Therefore, the trial court properly determined that Erica is entitled to one-half of the net proceeds of the wrongful death settlement, and we affirm the judgment of the trial court.

Affirmed.

Riley, J., and Tavitas, J., concur.